UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
:
J.S. & L.S.,
                                    Plaintiffs,       :
                                                      :
                          -v-                         :
                                                      :
NEW YORK CITY DEPARTMENT OF EDUCATION,                :
                                                      :
                                    Defendant.        :
                                                      :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/6/2015

14 Civ. 4315 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

Plaintiffs JS and LS (the "Parents"), individually and on behalf of their minor son, DS,

bring this action against the New York City Department of Education ("DOE"), pursuant to the

Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*

and Article 89 of the New York State Education Law, N.Y. Educ. Law § 4401 *et seq.* The Parents

seek review of a March 5, 2014 administrative decision of the State Review Officer ("SRO") that

(1) upheld the decision of the Impartial Hearing Officer ("IHO") that the proposed Individualized

Education Program ("IEP") did not deny DS a Free Appropriate Public Education ("FAPE"), and

(2) vacated the IHO's award of partial tuition to the Parents, which had been granted on the

ground that the DOE had had the duty to prove, but failed to do so, that the assigned school

could properly implement the IEP.

The parties have now cross-moved for summary judgment. For the following reasons,

the Court agrees with the SRO and the IHO that the IEP did not deny DS a FAPE. The Court

further agrees with the SRO that the DOE had no obligation to establish the appropriateness of

DS's specific brick-and-mortar placement. Accordingly, the Court grants the DOE's motion for

summary judgment and denies the Parents' motion for summary judgment.

I.      **Background**[1]

    A.      **Factual Background**

        DS is a 15-year-old student diagnosed with Tourette syndrome and generalized anxiety disorder. IHO Tr. 238. DS is of average intelligence. IHO Tr. 21. Despite his disabilities, as of June 2012, he was functioning at grade level in reading and one grade level behind in math. IHO Tr. 108. During the sixth and seventh grades, *i.e.*, the 2010–2011 and 2011–2012 school years, DS attended the Lang School ("Lang"), a private school for students who are "twice exceptional," meaning they are both "academically promising" and "have learning challenges such as ADHD, Dyslexia, [or] anxiety." IHO Tr. 329. At Lang, DS's class consisted of 10 students and two teachers, one general education teacher and one special education teacher. IHO Tr. 159, 162–63. For the 2010–2011 and 2011–2012 school years, the DOE fully funded DS's tuition at Lang. Parents Br. 2.

        On May 29, 2012, the Parents signed an enrollment contract with Lang for the 2012–2013 school year, DS's eighth-grade year. Ex. F, at 4. This contract had an "escape clause" so that the Parents could withdraw if DS received an appropriate public school placement from the DOE. *Id.* at 2.

    B.      **Committee on Special Education**

        On June 7, 2012, the DOE held a meeting of the Committee on Special Education ("CSE") to formulate DS's annual IEP for the 2012–2013 school year, as required by the IDEA. *See* 20 U.S.C. § 1414. Present at the CSE meeting were: Michelina Leone-Flick, a DOE

---

[1] This account of the facts is drawn from the parties' submissions in support of and in opposition to the cross-motions for summary judgment, specifically, the parties' briefing, Dkt. 17–23, and the administrative record from the proceedings below, including, *inter alia*, the transcript from the hearing before the IHO ("IHO Tr."), the Decision of the IHO ("IHO Dec."), the Decision of the SRO ("SRO Dec."), and exhibits submitted by both parties ("Ex.").

representative and social worker; Lindsey Dakin, a DOE special education teacher; Craig

Czarnecki, a DOE school psychologist; Dana Kirkwood, a special education teacher at Lang; LS,

DS's mother; Adrienne Schorr, a parent representative from an education advocacy organization

called Susan Luger Associates; and Zaida Cordero, a parent member. Ex. 8, at 9. At the

meeting, Kirkwood and LS provided information about DS. IHO Tr. 282–83, 356. Specifically,

Kirkwood explained that DS is "extremely anxious," "become[s] frustrated when he [is] faced

with a challenge," and "requires a lot of one-on-one" reinforcement and motivation. IHO Tr.

283. LS "repeatedly talked about [DS's] anxiety," IHO Tr. 356, and told the CSE that DS does

not do well in large groups, IHO Tr. 381. The meeting minutes taken by Leone-Flick reflect that

the group discussed DS's "challenges" including anxiety, low motivation, and difficulty

completing assignments with appropriate care, and his need for "coax[ing]," "motivation,"

"reminders," "example[s]," "remediation" and "individualized homework" in math, and other

"support." Ex. 7, at 2–3.

The CSE also considered a number of reports on and evaluations of DS, including: a fall

2011 through winter 2012 progress report from Lang, Ex. 6; a February 2012 psycho-educational

evaluation, Ex. 3; a February 2012 social history update, Ex. 5; and a March 2012 classroom

observation report, Ex. 4. The psycho-educational evaluation included a report from DS's

teacher at Lang, which explained that DS has an "adequate" level of attention, but he "can be

somewhat anxious," "has been observed moving away from noise," and "tends to shut down

when frustrated." Ex. 3, at 1. The progress report from Lang indicated that DS needs significant

one-on-one support including prompts to check his work, support in organizing his ideas, and

remedial sessions in math. Ex. 6, at 2–3, 5. The progress report also noted that DS sometimes

can complete his work with minimal prompting and that DS's goals include working more independently. *Id.* at 2, 10–11.

To supplement these documents, LS brought an independent psycho-educational evaluation that had been conducted in early 2011, Ex. B; the CSE, however, declined to review or consider it, IHO Tr. 378–79. The CSE also declined to conduct a functional behavior assessment ("FBA") of DS in advance of the meeting and did not develop a behavior intervention plan ("BIP"). Ex. 8, at 8.

Based on the information provided before and during the meeting, the CSE recommended that DS be placed in an Integrated Co-Teaching ("ICT") class for the 2012–2013 school year. Ex. 8, at 4–5, 7.[2] An ICT class is "an academically oriented class setting that contains students that are identified as having a special education need, and have an IEP developed for them, as well as students that are . . . non-disabled." IHO Tr. 38. An ICT class has around 25 students, of whom no more than 12 can be students with an IEP. IHO Tr. 38, 113; N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(g). Each ICT class has two teachers—one general education teacher who works with all students, and one special education teacher who provides additional instruction and support for the students with IEPs. IHO Tr. 38. The goal of the ICT program is to promote "fast-paced instruction" by integrating disabled students with "higher functioning" non-disabled students who can "support[] students who are struggling." IHO Tr. 113–14.

Czarnecki explained that the CSE recommended an ICT placement because DS "would need more support than would just be provided in a typical general classroom environment," but "based on his skills and abilities, he should be in an academically focused setting that would

---

[2] The CSE also recommended that DS receive weekly occupational therapy, group counseling, and individual counseling. Ex. 8, at 5.

appropriately challenge him and give him opportunities for working on the appropriate curriculum." IHO Tr. 38–39. Dakin confirmed that she understood DS's particular needs and that, based on her experience teaching ICT classes, the two teachers would provide those accommodations. *See* IHO Tr. 112–13, 116, 144, 154. In fact, she believed that DS was "a very typical candidate for an ICT class" and that other students in an ICT class "tend[] to need a lot of the similar strategies that [DS] benefitted from." IHO Tr. 115–16.

LS objected, during the CSE meeting, that a class with 25 students and two teachers would be "a disaster" for DS because large groups trigger his anxiety. IHO Tr. 381. She therefore requested a 12:1:1 or 12:1 placement. IHO Tr. 381. The CSE considered placing DS in a smaller class, but those classes are typically comprised of "lower functioning" students who may also have "behavioral issues." IHO Tr. 145–46. Accordingly, the CSE determined that DS's "academic progress would be limited" by the "much slower pace" in that setting, IHO Tr. 117, and rejected the 12:1:1 or 12:1 placement as "too restrictive to meet [DS's] goals," Ex. 8, at 8.

On August 15, 2012, the DOE sent the Parents notice of DS's placement, for the 2012–2013 school year, at the Henry Street School for International Studies ("H292"). Ex. 10.

On August 29, 2012, LS sent a letter to the DOE informing the agency that she had been unable to arrange a meeting at H292 and would therefore be unilaterally enrolling DS at the Lang School and seeking tuition reimbursement from the DOE. Ex. 11. In late August, 2012, LS was able to tour H292. IHO Tr. 384–85. She visited H292 a second time in mid-September, when school was in session. IHO Tr. 388. On September 4, 2012, LS sent another letter, which informed the DOE that she had visited H292 and had met with the assistant principal, who, she asserted, was "adamant" that H292 would not be an appropriate placement for DS. Ex. M. Specifically, LS alleged, the assistant principal had told her that students in the ICT class were

predominantly non-native English speakers, so their language skills would be weaker than DS's, and that the common areas in the school were very crowded and noisy due to the high number of students in the building. *Id.* LS's letter reiterated that the Parents would be placing DS at Lang for the 2012–2013 school year. *Id.* LS later testified that the assistant principal told her that the school was a "dumping ground for special ed students" and that he "would run the other way." IHO Tr. 389–90. The assistant principal who met with LS, however, denied making these comments and attested that, in fact, only 35% of the H292 student body is comprised of English as a second language ("ESL") students. IHO Tr. 423–26.

### C.   Due Process Complaint and Impartial Hearing

On April 22, 2013, DS's Parents, through an advocate at Susan Luger Associates, filed a due process complaint. They challenged the CSE's recommendation on the grounds that: (1) the Parents had been denied a meaningful opportunity to participate; (2) goals had not been developed at the meeting; (3) the CSE had denied DS transportation accommodations; (4) the CSE had failed to conduct an FBA; (5) the CSE had not been duly constituted; (6) the CSE had failed to perform adequate and appropriate evaluations; (7) the CSE had predetermined its recommendation and failed to discuss other programs; (8) the ICT program does not offer adequate or appropriate instruction, support, and supervision; and (9) the proposed placement school, H292, cannot implement the IEP. Ex. A.

An impartial hearing began on June 6, 2013 and concluded on September 13, 2013. IHO Tr. 1, 417. At that hearing, the IHO, Sharyn Finkelstein, heard testimony from: Czarnecki, the DOE school psychologist who participated in the CSE; Dakin, the DOE special education teacher who participated in the CSE; Joanne Chiu, a special education teacher at the Lang School; Samara Blei, the head psychologist at Lang; Kirkwood, a special education teacher at

Lang who participated in the CSE; Micaela Bracamonte, the head of Lang; Schorr, a parent

advocate who attended the CSE meeting; LS, DS's mother; and Edgar Lin, the former assistant

principal at H292.

Based on this testimony and the exhibits entered into evidence by both parties, the IHO

found that the ICT class had been an appropriate recommendation. IHO Dec. 12. However, she

held that the DOE "did not put on any witnesses with respect to the recommended school" and

therefore failed to satisfy its burden "to establish that the recommended placement could

implement the IEP." *Id.* at 13. The IHO further held that the Lang School was an appropriate

unilateral placement for DS. *Id.* at 15. Weighing the equities, the IHO awarded DS's Parents

partial tuition ($25,000) rather than full tuition ($49,500) because, she found, LS "had made up

her mind prior to the CSE meeting that [DS] would be attending the Lang School and that she

would be requesting an impartial hearing for tuition," and so LS did not go into the CSE meeting

"with an open mind." *Id.* at 16.

### D.    SRO Appeal

The DOE appealed the IHO's decision that it had not provided DS with a FAPE, and the

Parents cross-appealed the IHO's decision to award only partial tuition. The DOE argued that

the IEP, as written, was adequate, and that, inasmuch as DS had never attended the assigned

school, the DOE had not been required to defend that specific brick-and-mortar placement. The

DOE asserted that challenges to an assigned school are "speculative and inappropriate when the

student had never attended the recommended placement." The Parents, for their part, argued that

the IHO, in resolving whether the ICT was an appropriate recommendation, improperly

disregarded testimony from the Parents' witnesses and incorrectly analyzed the CSE's procedural

defects. Further, the Parents argued that they were entitled to an award of full tuition because they fully cooperated with the DOE.

The SRO, Justyn Bates, affirmed the IHO's decision in part and reversed in part. He upheld the IHO's finding that the ICT program had been an appropriate recommendation on the grounds that: (1) the lack of a general education teacher at the CSE meeting was a procedural violation but did not deny DS a FAPE; (2) the CSE had considered sufficient evaluative information; (3) although the annual goals were written out after the meeting, the substance of those goals had been discussed during the meeting; (4) the CSE had not been required to conduct an FBA because the record did not indicate that DS exhibited behaviors that interfered with his learning or that of other students; and (5) the ICT program recommendation had been reasonably calculated to enable DS to receive educational benefits. SRO Dec. 9–23. As to the specific placement, the SRO held that the validity of a recommendation is to be judged "on the face of the IEP," not on speculative evidence about how the IEP might have been implemented, and that it "would be inequitable to allow the Parents to acquire and rely on information that post-dates the relevant CSE meeting." *Id.* at 23–25. The SRO therefore reversed the IHO's decision that the DOE had not provided DS with a FAPE and vacated the award of partial tuition to DS's Parents. *Id.* at 25.

## E.   Procedural History of This Action

On June 16, 2014, having thus exhausted the administrative process, the Parents filed a Complaint in this Court. Dkt. 1. On December 3, 2014, the Parents filed a motion for summary judgment, Dkt. 17, along with a memorandum of law, Dkt. 18 ("Parents Br."). On January 16, 2015, the DOE filed a cross-motion for summary judgment, Dkt. 20, and a memorandum of law, Dkt. 21 ("DOE Br."). On January 30, 2015, the Parents submitted their reply. Dkt. 22 ("Parent

Reply"). And on February 13, 2015, the DOE submitted its reply. Dkt. 23 ("DOE Reply"). On March 13, 2015, the Court heard argument on the cross-motions. *See* Dkt. 24 ("Arg. Tr.").

## II.    Applicable Legal Standards

### A.    Legal Framework

The IDEA requires a state that receives federal education funding to provide all children with disabilities with a "free appropriate public education." 20 U.S.C. § 1412(a)(1)(A); *see also Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005). A FAPE should "emphasize[] special education and related services designed to meet [a disabled child's] unique needs and prepare [the child] for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). To accomplish that purpose, the DOE must develop an IEP for each disabled child that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see also* 20 U.S.C. § 1414(d)(1)(A); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 415 (2d Cir. 2009). The IEP must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982); *see also Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (citing *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)). It must provide an "'appropriate education, not one that provides everything that might be thought desirable by loving Parents.'" *R.B. ex rel. D.B. v. N.Y. Dep't of Educ.*, No. 14-1405, 2015 WL 1244298, at *1 (2d Cir. Mar. 19, 2015) (summary order) (slip op.) (quoting *Walczak*, 142 F.3d at 132); *see also Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 215 (2d Cir. 2012).

New York law charges a CSE with developing an IEP for a disabled child.  N.Y. Educ. Law § 4402(1)(b)(1); *see also R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012); *Walczak*, 142 F.3d at 123.  The CSE must consist of: the Parents of the student in question; the student's regular or special education teacher; a school psychologist; a district representative "qualified to provide or administer or supervise special education and . . . knowledgeable about the general curriculum and the availability of resources of the school district"; and an additional parent representative, among others.  N.Y. Educ. Law § 4402(1)(b)(1)(a).

When a parent believes that the state has failed to offer his or her child a FAPE, the parent may unilaterally place the child in a private school and seek reimbursement from the school district.  *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009); *see also M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 246 (2d Cir. 2012); *Cerra*, 427 F.3d at 192.  The parent must then file a due process complaint that challenges the appropriateness of the IEP and attend a hearing before an IHO.  N.Y. Educ. Law § 4404(1).  Under the *Burlington/Carter* reimbursement test, the DOE is required to pay for the private school tuition only if: (1) the program recommended by the IEP was inadequate or inappropriate; (2) the alternative placement the Parents chose was appropriate; and (3) the equitable factors weigh in favor of reimbursement.  *See Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 12–16 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 373–74 (1985); *see also T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363–64 (2d Cir. 2006).  A party aggrieved by an IHO's decision may appeal to an SRO.  20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2).  An appeal from the decision of an SRO may be brought as a civil action in federal or state court.  20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

### B.    Standard of Review

Summary judgment in the context of an IDEA case "'involves more than looking into disputed issues of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions.'" *R.E.*, 694 F.3d at 184 (quoting *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)). "The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.  While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C.*, 553 F.3d at 171 (citations and alterations omitted).  When the decisions of an IHO and a SRO conflict, the Court should generally defer to the SRO's decision as the "'final decision of the state authorities,'" *R.E.*, 694 F.3d at 189 (quoting *A.C.*, 553 F.3d at 171), particularly "when the state officer's review 'has been thorough and careful,'" *id.* at 184.  But when "the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges." *Id.* at 189 (citing *M.H.*, 685 F.3d at 246). SRO and IHO decisions that involve the substantive adequacy of an IEP and educational methodologies are to be given more weight than determinations about the procedure according to which an IEP was developed.  *See M.H.*, 685 F.3d at 244.

## III.   Discussion

The DOE concedes that the Lang School would have been an appropriate placement for DS if the DOE had failed to provide DS with a FAPE.  DOE Br. 9.  The parties dispute, however, whether the ICT class recommended in the IEP was appropriate to meet DS's needs.

Evaluating the adequacy of an IEP involves a two-step inquiry:  First, the Court must determine "whether the state has complied with the procedures set forth in the IDEA." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009).  Second, the Court must evaluate "whether the proposed IEP is substantively appropriate in that it is reasonably calculated to enable the child to receive educational benefits." *Id.* (citation omitted). The Court, after addressing the deference due to the SRO, considers, in turn, the Parents' procedural and substantive objections to the IEP.

### A.   Deference to the SRO

As a threshold matter, the Parents contend that the Court should not defer to the SRO's decision because he improperly disregarded the testimony of some of their witnesses.  Parents Br. 11–15.  Specifically, the SRO "focus[ed]" on "the information that was available to the June 2012 CSE at the time the June 2012 IEP was formulated."  SRO Dec. 22 n.18.  He therefore, the Parents claim, "eliminated from consideration the testimony of" the Parents' witnesses who had not participated in the CSE meeting and Kirkwood's opinions that she did not expressed during the meeting.  Parents Br. 12.  On this basis, the Parents argue that the SRO failed to "grapple with contrary evidence," and so his decision "cannot be described as 'well-reasoned'" and "merits no deference."  *C.L. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 1676 (JSR), 2013 WL 93361, at *7 (S.D.N.Y. Jan. 3, 2013), *aff'd*, 552 F. App'x 81 (2d Cir. 2014) (summary order).

The Parents' characterization of the SRO's decision is not accurate. The SRO addressed, in some detail, contrary evidence including Kirkwood's testimony, LS's testimony, and a recent progress report from Lang. *See* SRO Dec. 18–19, 21, 22–23, 25 n.19. This evidence provided ample information about DS's condition and needs, and, notably, both Kirkwood and LS strongly objected to the ICT placement during the CSE meeting. The Parents' other witnesses—Blei, a school psychologist at Lang; Chui, DS's special education teacher at Lang; and Bracamonte, the head of Lang—added little new information. Their testimony substantially overlapped with and primarily served to corroborate Kirkwood's and LS's testimony. This case is, therefore, distinguished from the cases in which courts have declined to afford deference to SRO decisions on the ground that they failed to grapple with contrary evidence. *See, e.g., F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 514 (S.D.N.Y. 2013) (deference not merited where SRO "failed to analyze conflicting testimony from *any* of the Parents' witnesses") (emphasis added); *C.L.*, 2013 WL 93361, at *7 (deference not merited where SRO "gave no explanation for why it credited the unfounded assertions of a school psychologist who had observed H.L. for only an hour and a quarter over the cogent testimony of multiple highly credentialed teachers who had worked closely with H.L. for a full school year"). That the SRO here did not explicitly address every witness's testimony does not undermine the Court's conclusion that his decision was generally well-reasoned and persuasive.

Moreover, the SRO, like this Court, "'should determine the appropriateness of an IEP as of the time it was made.'" *R.E.*, 694 F.3d at 186 (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564–65 (3d Cir. 2010)); *see also D.F. ex rel. N.F. v. Ramapo Cent. Sch. Dist.*, 430 F.3d 595, 599 (2d Cir. 2005) ("An IEP is a snapshot, not a retrospective. In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot

was taken, that is, at the time the IEP was promulgated.") (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990)). Although the SRO was permitted to consider the testimony of witnesses who did not participate in the CSE "to evaluate the reasonableness of the school district's decisions at the time they were made," *R.E.*, 694 F.3d at 186 (citation omitted), it was reasonable for the SRO to "focus" on "the information that was available to the June 2012 CSE at the time the June 2012 IEP was formulated," SRO Dec. 22 n.18. The Court therefore gives due deference to the SRO's decision, while also giving appropriate attention to the testimony that the SRO's decision did not address.

### B.   Procedural Challenges

"[A] procedural violation will constitute a denial of a FAPE 'only if the procedural inadequacies (i) impeded the child's right to a free appropriate public education; (ii) significantly impeded the Parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the Parents' child; or (iii) caused a deprivation of educational benefits.'" *J.C. ex rel. C.C. v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 3759 (PGG), 2015 WL 1499389, at *14 (S.D.N.Y. Mar. 31, 2015) (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)). Here, the Parents contend that: (1) it is unclear whether the DOE witnesses adequately prepared for the CSE meeting; (2) the CSE improperly excluded the 2011 independent psycho-educational evaluation; and (3) the CSE should have but failed to conduct an FBA and did not develop a BIP. The Court addresses each argument below.

### 1.   The DOE's Preparation for the CSE Meeting

The Parents argue that "it is unclear which documents, if any, Ms. Dakin, the DOE special education teacher, and Dr. Czarnecki, the DOE psychologist, 'reviewed and considered' in developing DS's 2012–2013 IEP." Parents Br. 15. The IHO rejected this argument, citing

Czarnecki's testimony to the effect that "the team did review and discuss all of the documents including tests and evaluations and reports that were available to them at the time of the meeting." IHO Dec. 10. The SRO concurred that "[t]he hearing record demonstrates that the June 2012 CSE reviewed and considered several sources of evaluative information in the development of the student's June 2012 IEP," including the February 2012 psycho-educational evaluation, the March 2012 class room observation report, and DS's Fall 2011–Winter 2012 Lang School progress report. SRO Dec. 12.

The Court agrees with the IHO and SRO. The Parents are correct that, at the time of the impartial hearing, neither Dakin nor Czarnecki could recall precisely which documents she or he reviewed before the CSE meeting. *See* IHO Tr. 121–22 (Dakin), 55 (Czarnecki). This lack of memory is understandable given the year-long gap between the CSE meeting, which took place on June 7, 2012, and the impartial hearing, which began on June 6, 2013. And both witnesses testified to their general practices: Czarnecki explained that, "as a matter of course," he would "look through the file" and review "any documents that appeared to be more recent or relevant." IHO Tr. 54–55. Similarly, Dakin stated that her "standard procedure" is to "review[] the previous IEP and any statements and recommendations that were made at the previous meeting." IHO Tr. 121. The Parents have provided no basis on which the Court can infer that Dakin or Czarnecki deviated from their usual practices in this instance. In addition, as the IHO noted, Czarnecki further testified that the CSE reviewed DS's psycho-educational evaluation, classroom observation report, and Lang progress report during the meeting. IHO Tr. 16–17, 19, 28. This testimony is corroborated by the CSE minutes, which indicate that materials were reviewed during the meeting. Ex. 7, at 1, 2. The Court therefore finds that Dakin's and Czarnecki's preparation for the CSE meeting was appropriate and consistent with providing DS with a FAPE.

15

2.      **Failure to Consider the Independent Evaluation**

The Parents next note that the CSE declined to consider the 2011 independent psycho-educational evaluation that LS provided.  Parents Br. 16.  That evaluation described DS as "withdrawn and somewhat removed" both in his classroom at Lang and in a one-on-one setting. Ex. B, at 2.  It attributed his difficulty sustaining concentration to "busy environment[s]," "unstructured circumstances," and "overwhelming performance anxiety" when confronted with difficult tasks.  *Id.* at 6, 8, 10.  The evaluation recommended that DS remain in a "small, highly structured special educational environment" where he can receive "extra direction at the outset of each task requiring independent work or sustained attention," and contended that "[a] less restrictive environment will most certainly lead to regression."  Ex. B, at 9, 11.

Both the IHO and the SRO summarily rejected the Parents' argument that the CSE should have considered the 2011 independent evaluation, based on Czarnecki's testimony that the CSE reviewed and discussed the most recent psycho-educational evaluation, which a DOE psychologist had conducted in February 2012.  IHO Dec. 10; SRO Dec. 12.  Under federal and state regulations, however, an independent educational evaluation "[m]ust be considered by the public agency, if it meets agency criteria, in any decision made with respect to the provision of FAPE to the child."  34 C.F.R. § 300.502(c)(1); *see also* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5.  DOE does not contend that the independent evaluation failed to satisfy agency criteria, for instance, because it was conducted by an unqualified individual.  The Court therefore finds that the CSE was required to consider the evaluation, and that its failure to do so was error.

This procedural violation, however, does not invalidate the IEP, for several reasons. First, as the IHO and SRO noted, the CSE did consider the 2012 psycho-educational evaluation. The CSE thus did not wholly disregard the behavioral observations, academic testing, and other

16

vital information contained in a psycho-educational evaluation. Rather, the CSE made a technically erroneous but substantively reasonable decision to rely on the most recent evaluation of DS. *See* 34 C.F.R. § 300.324 (requiring CSE to consider "[t]he results of the initial or most recent evaluation of the child"). And given the progress DS made during the 2011–2012 school year, *see* Ex. 6, the 2012 evaluation provided more relevant, timely, and accurate information than the 2011 evaluation. *See M.H.*, 685 F.3d at 256 (finding IEP valid where it "incorporated performance reports that were more recent than those submitted by [the Parents] at the CSE meeting," even if the CSE "failed to review [the Parents'] outside reports").[3]

Second, LS, DS's mother, was an active participant in the CSE meeting. She was in a position and at liberty to comment on any inaccuracies or omissions she perceived in the 2012 evaluation. And the CSE, in considering the 2012 evaluation, did in fact consider the critical points made in the 2011 evaluation. For example, both the 2011 and 2012 evaluations noted DS's difficulty with noise, *see* Ex. B, at 5, 11; Ex. 3, at 1, and the IEP addressed DS's need for individual attention, *see* Ex. B, at 11; Ex. 8, at 2, 4. It is, therefore, incorrect to conclude that the failure to consider the 2011 independent evaluation, although a procedural error, denied DS a FAPE. *See S.A. ex rel. M.A.K. v. N.Y.C Dep't of Educ.*, No. 12 Civ. 435 (RMM) (MDG), 2014 WL 1311761, at *11 (E.D.N.Y. Mar. 30, 2014) (finding IEP valid where "the private evaluators assessed the student's skills similarly to his teacher and therapists"); *F.B. v. N.Y.C. Dep't of Educ.*, 923 F. Supp. 2d 570, 589 (S.D.N.Y. 2013) (finding IEP valid where, even assuming that

---

[3] Notably, the CSE was not required to give the independent evaluation any particular weight or afford any deference to its recommendations. *See S.W. v. N.Y. Dep't of Educ.*, No. 14 Civ. 1754 (SHS), 2015 WL 1097368, at *10 (S.D.N.Y. Mar. 12, 2015) ("Consideration does not require substantive discussion, that every member of the CSE read the document, or that the CSE accord the private evaluation any particular weight.") (citing *T.S. v. Bd. of Educ. of Town of Ridgefield*, 10 F.3d 87, 89–90 (2d Cir. 1993)). Accordingly, the CSE could have satisfied this requirement by reviewing the 2011 evaluation and affirmatively deciding to disregard it in favor of the 2012 evaluation.

the CSE failed to consider a psycho-educational update report, "the Parents have not identified any facts or reasoning in it that were not also reflected in the other, substantial materials considered by the CSE").

### 3.      Failure to Conduct an FBA

Finally, the Parents object to the CSE's decision not to conduct an FBA or develop a BIP. Parents Br. 17–19, 25–28.  In support of this argument, the Parents note that DS is "extremely anxious, depressed, and withdrawn; had very low energy that resulted in frequent naps; exhibited low motivation; became frustrated when facing challenging situations; and needed constant 1:1 attention." Parents Br. 18.  Because these behaviors "impeded [DS's] ability to learn," they argue, the failure to conduct an FBA "resulted in an IEP that lacked the information necessary to tailor behavioral interventions to meet DS's unique needs" and denied DS a FAPE. *Id.* at 25, 28.

Under New York regulations, a CSE must, "in the case of a student whose behavior impedes his or her learning or that of others, consider strategies, including positive behavioral interventions, and supports and other strategies to address that behavior." N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(b)(3)(i).  These strategies include an FBA, which is "the process of determining why a student engages in behaviors that impede learning and how the student's behavior relates to the environment." *Id.* § 200.1(r).  FBAs are conducted "as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." *Id.* § 200.4(b)(1)(v).  An FBA must include an "identification of the problem behavior" and "the formulation of a hypothesis regarding the general conditions under which [the] behavior usually occurs." *Id.* § 200.1(r).  Where the student's behavior impedes his learning or that of his peers, the CSE should create a BIP that sets out "intervention strategies to be used to alter antecedent events to prevent the occurrence of the behavior, teach individual

18

alternative and adaptive behaviors to the student, and provide consequences for the targeted

inappropriate behavior(s) and alternative acceptable behavior(s)." *Id.* § 200.22(b)(4)(ii).

Notwithstanding those requirements, the case law is clear that "a failure to conduct an

FBA . . . it does not rise to the level of a denial of a FAPE if the IEP adequately identifies the

problem behavior and prescribes ways to manage it." *R.E.*, 694 F.3d at 190; *see also A.C.*, 553

F.3d at 172 (failure to perform FBA did not render IEP legally inadequate in light of IEP's

provision of strategies to address child's behavior); *T.Y.*, 584 F.3d at 419 ("substantial evidence in

the record" of ways to address problematic behaviors provided basis for SRO to conclude that,

despite failure to conduct a FBA or a BIP, a FAPE was not denied).

Applying these standards to the record evidence, the IHO's and SRO's finding that the

lack of an FBA and a BIP did not deny DS a FAPE is persuasive and merits deference. First, as

both the IHO and the SRO concluded, there was no evidence that DS's behavior interfered with

his own or another's ability to learn, and so the CSE was not required to conduct an FBA or BIP.

IHO Dec. 10–11; SRO Dec. 17–21; *see also* N.Y. Comp. Codes R. & Regs. tit. 8 § 200.4(b)(1)(v)

(individual evaluations must include FBAs "as necessary"). Citing Kirkwood's testimony, the

Parents note that DS is "extremely anxious, depressed, and withdrawn; had very low energy that

resulted in frequent naps; exhibited low motivation; became frustrated when facing challenging

situations; and needed constant 1:1 attention." Parents Br. 18. Citing the 2011 independent

psycho-educational evaluation, the Parents also argue that DS "struggle[s] with self-regulation

and emotional difficulties" that "have impacted his ability to progress at a rate that is

commensurate with his cognitive potential." Parents Br. 26. With the exception of "frequent

naps," however, these lists describe DS's demeanor and emotional state; they do not identify

problematic behavioral manifestations. As the SRO explained after carefully reviewing the

evidence presented at the hearing, "the student suffered from anxiety, low energy, low motivation, and frustration," but "the hearing record does not contain sufficient evidence with regard to how the student's difficulties in these areas resulted in the student engaging in behaviors that either impeded his learning, or that of others, to the extent that the district was required to conduct an FBA."  SRO Dec. 19.

Moreover, the potential problem behavior suggested by this list—namely, disengaging as a result of anxiety or frustration—is not the type of serious conduct that necessitates an FBA. *Compare R.E.*, 694 F.3d at 194 (FBA required where student exhibited "self-stimulatory behaviors which interfere with her ability to attend to tasks and to socially interact with others" such as finger-flicking, jumping up and down, and producing inappropriate utterances); *Danielle G. v. N.Y.C. Dep't of Educ.*, No. 06 Civ. 2152 (CBA), 2008 WL 3286579, at *10 (E.D.N.Y. Aug. 7, 2008) (FBA required where student "engages in self-stimulatory activity and is hyper-active" in a way that "impede[s] her ability to learn"), *with T.M.*, 752 F.3d at 169 (FBA not required to address behaviors including "distractibility, inattentiveness and difficulty remaining on-task, noncontextual vocalizations, [and] finger twirling"); *R.E.*, 694 F.3d at 183, 195 (FBA not required because student's behaviors, including "a history of biting her hands and hitting herself," did not "seriously interfere with instruction"); *A.D. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2673 (RA), 2013 WL 1155570, at *9 (S.D.N.Y. Mar. 19, 2013) (FBA not required where student had anxiety but "was no longer aggressive toward people around her"); *Connor ex rel. I.C. v. N.Y.C. Dep't of Educ.*, No. 08 Civ. 7710 (LBS), 2009 WL 3335760, at *4 (S.D.N.Y. Oct. 13, 2009) (FBA not required to address student's "anxiety and fidgeting").  The Court therefore agrees with the IHO's and SRO's conclusion that DS's behavior did not interfere with his learning to an extent that the CSE was required to conduct an FBA.

Second, even if an FBA had been required, the failure to conduct one "does not rise to the level of a denial of a FAPE if the IEP adequately identifies the problem behavior and prescribes ways to manage it." *R.E.*, 694 F.3d at 190; *see also A.C.*, 553 F.3d at 172–73 ("The 2004–2005 IEP provided for strategies to address M.C.'s behavior. . . . Thus, the failure to perform an FBA of M.C. did not render the IEP legally inadequate."); *E.F. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 2217 (MKB), 2013 WL 4495676, at *23 (E.D.N.Y. Aug. 19, 2013) ("The absence of an FBA does not render an IEP procedurally inadequate, since as described above, the IEP did consider behavioral strategies, such as sensory tools and an adaptive chair to address E.F.'s behavior."); *F.B.*, 923 F. Supp. 2d at 584 (finding IEP adequate where "the source of [the student's] dysregulation 'had already been identified,'" and "the IEP included strategies for addressing [the student's] behaviors"); *Perricelli v. Carmel Cent. Sch. Dist.*, No. 06 Civ. 2114 (MS) (LMS), 2007 WL 465211, at *13 (S.D.N.Y. Feb. 9, 2007) ("[T]he 2005–06 IEP was capable of meeting S.P.'s behavioral needs.  Thus, the 2005–06 IEP cannot be deemed procedurally inadequate due to the lack of an FBA or behavioral modification plan."); *cf. P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ.*, 819 F. Supp. 2d 90, 107 (E.D.N.Y. 2011), *aff'd*, 526 F. App'x 135 (2d Cir. 2013) (summary order) (FBA not required where "strategies that were utilized by [the student's] current providers seemed to be moving her towards the right direction").

Here, the SRO's determination that "the June 2012 IEP included sufficient information regarding the student's behavioral and management needs" is well-reasoned and persuasive. SRO Dec. 21. As the SRO noted, the CSE had ample information about DS's behavior:  The 2012 psycho-educational evaluation includes DS's teacher's report that DS is "anxious" and "tends to shut down when frustrated." Ex. 3, at 1.  Similarly, the 2011–2012 progress report from Lang explains that DS has trouble sustaining motivation and focus. Ex. 6, at 8, 9, 11.  The

classroom observation report also recounted an incident in which DS had left class because "he did not feel well and thought he had a fever"; his teacher nevertheless described the day as "typical." Ex. 4, at 1–2. During the CSE meeting, Kirkwood and LS provided additional information about DS, and the group discussed DS's challenges including anxiety, low motivation, and difficulty remaining engaged. *See* Ex. 7, at 2; IHO Tr. 80 (Czarnecki), 109–10 (Dakin), 283–85 (Kirkwood), 356 (Schorr), 381 (LS). The IEP explicitly discusses these challenges. *See, e.g.*, Ex. 8, at 1–2 ("[DS] does not do well due to his anxiety and lack of motivation."). Where, as here, a student's "behaviors were well-known and were discussed at the CSE meeting," "the failure to conduct an FBA [does] not rise to level of denial of a FAPE" so long as the IEP contains adequate strategies for managing those behaviors. *P.L. v. N.Y. Dep't of Educ.*, No. 12 Civ. 2097 (PKC) (VMS), 2014 WL 4907496, at *10 (E.D.N.Y. Sept. 29, 2014) (citing *R.E.*, 694 F.3d at 190).

LS and Kirkwood identify, as a strategy for dealing with DS's anxiety and low motivation, the importance of "constant 1:1 attention." Parents Br. 18, 27. The Lang progress report that was before the CSE, however, addressed this consideration. It stated that DS benefits from prompting, review, and other direct support from teachers. Ex. 6. Based on this and other information available at the CSE meeting, the committee members understood that DS needs reminders, prompts, and repetition to overcome his deficits in motivation and engagement. IHO Tr. 109–10 (Dakin). Consistent with this understanding, the "management needs" section of the IEP states that DS will receive "verbal and visual cues and prompts," "repetition, practice, and review," "scaffolded instruction," "teacher modeling of math problems," and "access to sensory tools and strategies." Ex. 8, at 2. The "annual goals" section specifies that DS will receive "verbal support, scaffolded lessons, and repetition and review" to promote progress in math, and

"verbal support and encouragement" to improve his reading fluency. *Id.* at 4. And the "present levels of performance and individual needs" section explains that DS "receives individualized math homework based on his skills to reduce his anxiety," "needs reminders and support to use punctuation and correct grammar" because he "forgets" when his engagement is low, and needs "coax[ing]" and "pep talks" to overcome his anxiety and low motivation. *Id.* at 1–2. In light of these aspects of the IEP, the SRO reasonably, and in the Court's view correctly, concluded that "the recommended strategies to address the student's management needs, as well as additional teacher supports, ICT services, and the annual goals in the June 2012 IEP rescued any inadequacy." SRO Dec. 19.

### C.   Substantive Challenges

The Parents argue that the IEP was substantively inadequate because: (1) DS would not receive sufficient one-on-one attention in an ICT class; (2) the DOE improperly defaulted to an ICT placement because it had no smaller classes appropriate for DS; and (3) conditions at the assigned school would have denied DS a FAPE. The Court addresses these claims in turn.

### 1.   Whether an ICT Class was Appropriate for DS

The Parents argue that DS could not have made progress in an ICT setting. Parents Br. 19–21. Citing Blei's testimony, they claim that DS "needs a tremendous amount" of one-on-one support "to remain motivated, on task, and engaged," "would withdraw in a larger classroom setting due to [his] anxiety and depressed mood," and would find a class of 25 students "overwhelming." *Id.* at 20. The DOE does not dispute that DS suffers from "anxiety" and "low motivation," or that he requires strategies such as "repetition, prompting, encouragement, [and] review" to succeed in the classroom. DOE Br. 22. However, the DOE argues, "[t]he CSE duly took into account these concerns" and generated a recommended placement that would have

23

provided the support DS needs while allowing him "to realize his considerable academic potential." *Id.* at 21, 23. In other words, the parties agree as to the nature of DS's disability and necessary accommodations; their dispute turns on whether the recommendation of an ICT class placement was "reasonably calculated to enable [DS] to receive educational benefits." *Rowley*, 458 U.S. at 207.

The IHO concluded that "an ICT class was an appropriate recommendation." IHO Dec. 12. She recognized DS's "issues with motivation," "engagement," and "anxiety," and his need for "strategies such as repetition, prompting, [and] reminders." *Id.* at 5. And she noted the Parents' concern that DS would have trouble in a class with 25 students because of his anxiety. *Id.* at 11. However, she credited Dakin's testimony that "management needs are typically provided within an ICT class," that "there is opportunity for individual instruction," and that DS was "a typical candidate for an ICT class." *Id.* at 11–12. The IHO therefore found that "an ICT class could provide [the] prompts, support, and encouragement that [DS] needs," and, "in keeping with the least restrictive environment requirement," was an "appropriate recommendation." *Id.* at 12.

The SRO, similarly, concluded that the "CSE's recommendation for ICT services in a general education setting, together with the related services, was reasonably calculated to enable the student to receive meaningful educational benefits." SRO Dec. 21. The SRO's decision provided a detailed summary of the evaluations available to the CSE and the information about DS contained therein. *Id.* at 12–14. It acknowledged, among other things, reports that DS was "extremely anxious," "withdrawn," "depressed," and "low energy," necessitating "one-on-one attention from adults to provide directions, explicit positive reinforcement, and motivation." *Id.* at 14. Like the IHO, however, the SRO credited Dakin's testimony that DS was "a very typical

24

candidate for an ICT class setting" and that "the teachers in an ICT setting would do what was

necessary to meet [DS's] needs," including by providing one-on-one instruction. *Id.* at 22.

Because an ICT class would meet DS's needs and would not be "too restrictive," the SRO found

that the ICT class recommended in the IEP was appropriate. *Id.* at 23.

     As to this central issue, the Court finds the IHO's and SRO's decisions to be well-

reasoned, persuasive, and worthy of deference.  Because the IHO and SRO have far greater

expertise than this Court, and reached the same conclusion about the appropriateness of the ICT

recommendation, deference is due to the administrative officers. *See R.E.*, 694 F.3d at 189 ("[A]

court must defer to the SRO's decision on matters requiring educational expertise unless it

concludes that the decision was inadequately reasoned."); *P.G. v. N.Y.C. Dep't of Educ.*, 959 F.

Supp. 2d 499, 511 (S.D.N.Y. 2013) ("In light of the relative institutional competence of the

state's adjudicators in addressing matters of education policy, more deference is owed to the

SRO's decision regarding the substantive adequacy of the IEP than was owed in the prior

analysis regarding procedural adequacy." (citing *M.H.*, 685 F.3d at 244)).

     The IHO's and SRO's conclusions also have substantial support in the record.  Dakin, a

DOE special education teacher, testified that an ICT class was an appropriate placement for DS

for the 2012–2013 school year.  Based on her experience teaching general education, ICT, and

12:1:1 classes for several years, IHO Tr. 106, Dakin testified that DS was "a very typical

candidate for an ICT class," IHO Tr. 115.  She has "had students diagnosed with anxiety in [her]

ICT" classes, and they have done "quite well" in that setting. IHO Tr. 154.  Concretely, Dakin

testified that DS's particular management needs—including reminders, prompts, repetition,

coaxing, and individualized assignments—would be met in an ICT class, IHO Tr. 109–16, and

that ICT classes provide opportunities for "small group or individualized instruction," IHO Tr.

113; *see also* IHO Tr. 116 (a "typical day" in an ICT class includes "small group" and "1:1 work"). Dakin further testified that DS's "academic progress would be limited" in a smaller class setting, where other students would "require a much slower pace and a larger amount of support." IHO Tr. 117.

Czarnecki, who has worked as a DOE school psychologist for nearly two decades and has observed ICT classes in the past, IHO Tr. 12, 76–77, similarly testified that the ICT class was an appropriate recommendation. In Czarnecki's view, the information about DS presented to the CSE indicated that DS had "very good academic strengths" as well as some "weaknesses." IHO Tr. 84. DS therefore "would need more support than would just be provided in a typical general classroom environment," but he also "should be in an academically focused setting that would appropriately challenge him and give him opportunities." IHO Tr. 39. Czarnecki testified that an ICT class would allow DS "to make progress" with "the support of a special educator in addition to a general educator." IHO Tr. 84. And Czarnecki disagreed that a class of 25 students would be detrimental to DS: The psycho-educational evaluation indicated that DS "becomes easily overwhelmed when perceiving a task as challenging," so that anxiety could arise "regardless of the setting." IHO Tr. 81.

The Parents' witnesses did not undermine Dakin's or Czarnecki's testimony. To be sure, each opined that an ICT class was not an appropriate placement for DS. *See* IHO Tr. 206–07 (Chiu), 262–63 (Blei), 286–87 (Kirkwood), 392–93 (LS). But the concrete facts to which they attested are consistent with those underlying the CSE's recommendation. Their descriptions of DS's condition and needs, as noted, were similar to Dakin's: They explained that DS has Tourette syndrome, anxiety, and depression. IHO Tr. 238, 254, 283, 372–73. As a result, he is lethargic, has low energy, and often becomes withdrawn. IHO Tr. 159–61, 237–38, 283, 373–74.

26

To overcome these challenges, DS needs previews, encouragement, reminders, and frequent one-on-one support.  IHO Tr. 161–62, 165, 172–74, 184, 190, 238, 249, 252–53, 255–56, 283.

The Parents' witnesses acknowledged that some of these needs could be met in an ICT classroom.  For instance, Chiu testified that she provided some previewing when she taught an ICT-like class.  IHO Tr. 232.  Their primary concern was whether DS would receive sufficient one-on-one attention in a class with two teachers and 25 students.  *See* IHO Tr. 276 (whether an ICT class would meet DS's needs "depends upon the amount of support they could give him at that time because [he] requires lots of 1:1 support"); *see also* IHO Tr. 230–31, 262–63, 286.  Concretely, Chui explained that when given an assignment, DS usually makes a "superficial first attempt" and sometimes "skip[s] questions."  IHO Tr. 165–66, 177–78.  He also tends to "just sit there" rather than checking his work, asking for help, or telling a teacher he is finished.  IHO Tr. 165–66.  Accordingly, DS needs frequent one-on-one attention to "see if he is on task," "push[] him further," "re-explain" material, clarify expectations, and provide "positive reinforcement."  IHO Tr. 165, 172–73, 177–78.  Blei elaborated that DS needs an "extra boost and encouragement" to remain "engaged"; without it, he will "completely withdraw."  IHO Tr. 249.  As DS's teacher, Chiu met his needs by checking in with him briefly every three to five minutes.  IHO Tr. 177.[4]

In an ICT class—with one general education teacher for approximately 25 students and one special education teacher for, at most, 12 students—each special education student could expect to receive a check-in about every 10 minutes.  The Court does not doubt that DS received a greater quantity of one-on-one support in a 10:2 class at Lang than he would have in an ICT

---

[4] Chiu and Kirkwood both testified that DS requires "constant" one-on-one attention.  IHO Tr. 177 (Chiu), 284 (Kirkwood).  Considering their testimony in its broader context, it is clear that these witnesses used "constant" to mean very frequent attention, not literally nonstop attention.  In fact, Blei testified that DS withdraws if he "feel[s] like he [is] the main focus and there [is] something wrong with him," and so DS sometimes benefits from "a little bit of space" and "a hands-off approach."  IHO Tr. 242.

class.  But the Court has no basis to find that the lower quantity of one-on-one attention was

patently deficient.  The IDEA guarantees "'an appropriate education, not one that provides

everything that might be thought desirable by loving parents.'"  *R.B.*, 2015 WL 1244298, at *1

(quoting *Walczak*, 142 F.3d at 132).  The DOE is therefore required to provide only a "basic floor

of opportunity"; "it need 'not . . . furnish every special service necessary to maximize each

handicapped child's potential.'"  *M.H.*, 685 F.3d at 224, 243 (quoting *Grim v. Rhinebeck Cent.*

*Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003)) (omission in original).  Moreover, the DOE is

required to provide such opportunities in the "least restrictive educational environment that is

consonant with [the student's] needs," *T.M.*, 752 F.3d at 161, placing a thumb on the scale for

placement in a larger class that includes non-disabled students, *P. ex rel. Mr. & Mrs. P. v.*

*Newington Bd. of Educ.*, 546 F.3d 111, 119 (2d Cir. 2008).  Applying these standards to the

administrative record, the Court therefore finds that the IEP was "reasonably calculated to enable

[DS] to receive educational benefits," *Rowley*, 458 U.S. at 207, and was "likely to produce

progress, not regression," *Cerra*, 427 F.3d at 195.

     The Parents' witnesses also expressed concern that DS would be overwhelmed by the

sheer number of students in an ICT class.  IHO Tr. 197, 206, 262–63, 286, 392.  As LS

explained, DS has "sensory issues," such that "noises" and "certain touches" tend to "affect him

greatly."  IHO Tr. 373; *see also* IHO Tr. 168, 197, 230 (Chiu), 286 (Kirkwood).  It is certainly

reasonable to assume that a class of 25 students is likely to produce more noise and inadvertent

touching than a class of 10 students.  However, the testimony indicated that DS has successfully

used simple coping mechanisms to address such circumstances.  For example, Chiu testified that

DS's class at Lang includes some students who are "impulsive" and "very loud."  IHO Tr. 212.

When "the sensory stuff really gets to him," DS likes to "put on headphones and listen to music"

or "physically remove himself from the larger group to be able to concentrate on what he's doing." IHO Tr. 168. The record suggests that an ICT teacher could facilitate these or other strategies to help DS overcome his sensory issues. *See, e.g.*, IHO Tr. 113–16 (noting that ICT classes provide opportunities for small-group and one-on-one instruction). Further, despite DS's sensory issues, Chiu testified that "he potentially could be great" in a class of 20 or so students in the future, indicating that his sensory issues are not extreme or insurmountable. IHO Tr. 197.

In addition, as Czarnecki observed, the psycho-educational evaluation indicated that DS "becomes easily overwhelmed when perceiving a task as challenging," so his anxiety could arise "regardless of the setting. It's based on the task, rather than the setting." IHO Tr. 81. The Parents' witnesses agreed that DS's anxiety is "subject dependent," IHO Tr. 195, and results from "academic material that's really challenging for him," IHO Tr. 255; *see also* IHO Tr. 161 (describing DS as "more withdrawn" in math and "when faced [with] a problem that he is having difficulty with"); IHO Tr. 283 (noting that DS "become[s] extremely frustrated when he [is] faced with a challenge"); Ex. 3, at 1 (explaining that DS "tends to shut down when frustrated"). The extent to which DS's anxiety and withdrawal result from noise or inadvertent touching as opposed to challenging tasks is, therefore, open to debate, making deference to the SRO's reasonable conclusions all the more appropriate.

### 2. Whether DOE Provided an Adequate Continuum of Options

It is undisputed that the CSE considered placing DS in a 12:1 or 12:1:1 class but rejected those options because such smaller DOE classes are typically comprised of students who have serious behavioral issues and require a slower pace of instruction than DS does. Parents Br. 22; IHO Tr. 117; Ex. 8, at 8. The Parents now argue that DOE violated its obligation to provide a continuum of services by failing to offer DS an appropriate smaller class—in other words, the

Parents argue, DOE should have created a 12:1 or 12:1:1 class comprised of students who, like DS, perform well academically but also struggle with anxiety or similar disorders. Parents Br. 22–23; Arg. Tr. 23.

Under the IDEA's implementing regulations, school districts are required to "ensure that a 'continuum of alternative placements is available to meet the needs of children with disabilities,' including 'instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions.'" *T.M.*, 752 F.3d at 161 (quoting 34 C.F.R. § 300.115). School districts must also provide "'supplementary services []such as [a] resource room.'" *Handberry v. Thompson*, 446 F.3d 335, 351 (2d Cir. 2006) (quoting 34 C.F.R. § 300.115). These regulations, however, do not "impose[] a duty upon the state to ensure that there be a placement option specifically suited for [a student's] particular needs and goals." *Straube v. Fla. Union Free Sch. Dist.*, 801 F. Supp. 1164, 1176 (S.D.N.Y. 1992). Nor do they create an obligation "to provide a specific program." *Id.* (citing *Lachman v. Ill. State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988)). The DOE was thus not required to offer DS the best possible placement; it was required only to provide him with an appropriate education. *M.H.*, 685 F.3d at 224, 243; *R.C. ex rel. M.C. v. Byram Hills Sch. Dist.*, 906 F. Supp. 2d 256, 273 (S.D.N.Y. 2012) ("While it is natural to assume that a student would benefit from being in a smaller classroom environment with more support, the IDEA does not require that the District provide an ideal learning environment, but instead only one where the student can progress."). For the reasons explained at pages 23–29, *supra*, the DOE satisfied this burden.

**3.      Whether the Placement at H292 Denied DS a FAPE**

The Second Circuit has "adopt[ed] the majority view that the IEP must be evaluated prospectively as of the time of its drafting." *R.E.*, 694 F.3d at 186 (citing, *inter alia*, *Adams v.*

*Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999); *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 530 (3d

Cir. 1995); *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990)).  Accordingly,

"both parties are limited to discussing the placement and services specified in the written plan."

*Id.* at 187.  Although "testimony may be received that explains or justifies" the adequacy or

inadequacy of "the services listed in the IEP," *id.* at 186, "the validity of the proposed placement

cannot be evaluated using speculative evidence concerning how the IEP might have been

implemented," *S.W.*, 2015 WL 1097368, at *6.  The Parents' counsel conceded as much at

argument.  *See* Arg. Tr. 13–14.

On this basis, the Court rejects the Parents' generalized objections to the brick-and-mortar

placement.  In particular, LS testified that someone told her that H292 was a "dumping ground

for special education students" and that she should "run the other way."  IHO Tr. 389–90.  The

Parents therefore contend that H292 was an inappropriate placement.  Parents Br. 24.  Because

DS never attended H292, however, LS's concerns about how the school might have implemented

the IEP are speculative, and the Court cannot consider them.  *See R.E.*, 694 F.3d at 195; *T.G. ex

rel. R.P. v. N.Y.C. Dep't of Educ.*, 973 F. Supp. 2d 320, 343 (S.D.N.Y. 2013); *S.W.*, 2015 WL

1097368, at *14; *Straube*, 801 F. Supp. at 1181.

Apart from those general objections, the Parents make two discrete arguments to the

effect that, even if H292 implemented the IEP perfectly, conditions at the school necessarily

would have denied DS a FAPE.  Parents Br. 23–24.  Concretely, LS testified that she visited

H292 twice.  IHO Tr. 395–96.  During these visits, she learned that: (1) a significant portion of

the students at H292 are non-native English speakers who have weaker language skills than DS

has, IHO Tr. 389, 405, and (2) the large student body produces noisy common areas, which

would trigger DS's anxiety, IHO Tr. 373–74, 392.  These objections are not inherently

impermissibly speculative. *Cf. K.R. ex rel. Matthew R. v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 7464 (SAS), 2015 WL 1808911, at *9–10 (S.D.N.Y. Apr. 20, 2015) (concerns regarding access to sensory equipment and functional grouping were not speculative); *Scott v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 444–45 (S.D.N.Y. 2014) (concern about the availability of the recommended 12:1:1 class at the assigned school was not speculative). And the underlying facts—in essence, the size of the student body and the percentage of ESL students—were reasonably known to the DOE "at the time of the placement decision." *R.E.*, 694 F.3d at 187.

Accordingly, the SRO erred in dismissing the Parents' objections to H292 as speculative and thereby declining to consider their merits. *See* SRO Dec. 23–25. However, the IHO's decision, to the extent it held that the DOE had the burden of "establish[ing] that the recommended placement could implement the IEP," IHO Dec. 13, was also erroneous. To the contrary, "[p]laintiffs bear the burden of proof on prospective challenges to the adequacy of a proposed placement." *S.W.*, 2015 WL 1097368, at *15 n.9. Because neither of these administrative decisions merits deference, the Court reviews this issue *de novo*.[5]

As to the first issue, Edgar Lin, the former Assistant Principal of H292, testified that "approximately 35%" of the students at H292 are ESL students, IHO Tr. 426, and that H292's ICT class does include some ESL students, IHO Tr. 430. As such, the Court can fairly infer that the ICT class would have included some students whose language skills were weaker than DS's.

---

[5] In other cases, this Court has remanded unaddressed issues to the SRO. *See F.B.*, 923 F. Supp. 2d at 589. Remand is appropriate "where the district court has received insufficient guidance from state administrative agencies as to the merits of a case," *N.Y.C. Dep't of Educ. v. V.S.*, No. 10 Civ. 5120 (JG) (JO), 2011 WL 3273922, at *11 (E.D.N.Y. July 29, 2011), or where proper resolution of the disputed issue requires expertise, *see D.N. v. N.Y.C. Dep't of Educ.*, 905 F. Supp. 2d 582, 589 (S.D.N.Y. 2012). However, the Court has authority to decide the issues on the merits. *V.S.*, 2011 WL 3273922, at *10. Here, the unaddressed issues are narrow and unrelated to the substance of the IEP. The Court's judgment is that "the drawbacks of remanding the case to the SRO"—namely, delay and further litigation expense—"outweigh the benefits." *Id.* at *10. The Court therefore reaches the merits of these two discrete arguments.

However, ICT classes integrate special education students with general education students who "tend[] to be either on grade level or slightly above grade level." IHO Tr. 141. These "higher functioning" students can "support[] students who are struggling." IHO Tr. 113–14. The Court therefore infers that the ICT class also would have included some students whose language skills were equal to or stronger than DS's.

The testimony at the impartial hearing established that DS has made progress in classes with a similar range of students. At Lang, DS spent three years in a "bridge class" with sixth, seventh, and eighth graders. IHO Tr. 163, 330–31. As a seventh and eighth grader performing at grade level in English, IHO Tr. 108, DS had classmates with weaker language skills than he did, IHO Tr. 180 ("[H]is skillsets and his goals for editing are very different from a sixth grader."). DS nevertheless made progress in that setting. IHO Tr. 175–76, 192, 339–41. As such, the Court has no basis to find that an ICT class with some ESL students inherently would have caused DS to regress and not to progress ahead. *See Cerra*, 427 F.3d at 195.

Turning to the second issue, the Parents argue that DS would have become "anxious as a result of the heightened noise level in H292's common areas" during lunch or transitions between classes. Parents Br. 24. To support this claim, the Parents cite LS's testimony about DS's experiences in kindergarten. IHO Tr. 373–74, 392. The Court credits LS's account of DS's struggles during lunch and recess during his earliest school days, but the testimony adduced at the hearing does not establish that those problems continued over the next eight years. To the contrary, Chiu testified that DS will "tolerate" crowds "as long as there is somebody there that he is comfortable with." IHO Tr. 203. On a field trip to the New York Stock Exchange, for example, DS was very vocal about his desire to avoid large groups of people but was not so anxious as to require a teacher to take him back to school. IHO Tr. 202–03. Accordingly, the

Court finds that the common areas at H292, although undoubtedly noisier and more crowded than those at Lang, would not have denied DS a FAPE.

**CONCLUSION**

For the foregoing reasons, the DOE's motion for summary judgment is granted, and the Parents' motion for summary judgment is denied.  The Clerk of Court is directed to terminate the motions pending at docket numbers 17 and 20, and to close this case.


SO ORDERED.

Paul A. Engelmayer
United States District Judge


Dated: May 6, 2015
      New York, New York